May it please the Court, Nancy Spiegel for Plaintiff Appellant, United States of America. I would like to reserve two minutes of my time for rebuttal. In this case, the government's position is that the District Court erred in granting a four-level downward departure based on cultural assimilation. We contend this for several reasons. First of all, the case outside the heartland of defendants who have illegally reentered the United States, especially defendants who have repeatedly reentered the United States as defendant in this case. The facts established were that the defendant had lived here for many years and had family members here. However, he did have a sister in Tijuana who had offered him a place to live and a job, and he had a wife and children here, but the facts showed that he hadn't lived with them for many years, and that they were willing to accommodate him and meet with him once he had been deported. So, in sum, the totality showed that there was really no compelling reason for his illegal reentry, and therefore there was no grounds for the cultural assimilation departure. Counsel, as I read what the District Court said, though, the Court was not relying on but on a combination of factors, including the judge's view that the defendant had moved away from a life of crime and was attempting to lead a more normal life, and some other factors, including his family. So how does that play into your calculus of whether there was an error? Well, our reading of the Court's holding is a little bit different, Your Honor. The Court did make comments regarding the fact that the defendant had familiar support in response to defense counsels pointing out that family had been in the courtroom and had submitted letters. However, the Court's actual holding, as stated on page 156 of the government's excerpt of record, was, considering the combination of factors as has been suggested by the defense, I am going to depart downwardly, and particularly because of cultural assimilation. Okay. The combination of factors, and particularly cultural assimilation, suggests to me that there's a combination of factors. That's the most important one, but it's not the only one. Well, that may be true, but that was the only one. So how does that affect your analysis if it's not the only factor? Well, the other factors that the Court may have looked at regarding the family are related to the cultural assimilation factors, in that he's talking about family ties. And he also says that in his view, the defendant has changed his ways even before coming to court. So is that a permissible basis to consider departure? Well, the Court can depart based on a finding of post-defense rehabilitation, if that's how the Court saw this. But our argument would still be that all those factors, even granting that the Court's decision was based on all the factors raised, doesn't take into account any of the aggravating factors in this case. Most importantly, the number of illegal reentries by this defendant. And our position, really, on the cultural assimilation claim is that once someone like this defendant has been reported twice, he voluntarily left once. But he illegally reentered the United States three times. And the message should be clear that you're no longer culturally assimilated to the United States once the government has said. Let me just be specific, if I may, following up on Judge Graber's questions. My recollection is that Ruiz argued to the district court that a departure was warranted for a number of reasons. The sentencing guidelines are unduly harsh in his case. He's tried to change his life since his last go in prison. He's now married and has a young daughter. He's a hard worker and a good person. His wife's health is bad. His sisters offered him a place to live. He values his family. He seeks to reunite with them. He asked for an opportunity to do so. Now, those were the factors that he listed. Are those appropriate factors for a departure to consider along with cultural assimilation? Do they add to it, subtract from it? Are they relevant, irrelevant? Well, this Court has held in the guidelines hold that family ties, and many of those factors go to family ties apart from the cultural assimilation part of the argument, are a disfavored ground for departure. And so we argue that those aren't relevant. They don't add to it. There was no real evidence adduced that he had changed his ways or rehabilitated in any way that would be appropriate. The court in Lipman, which is the seminal case on cultural assimilation, found that there, the defendant, his entire family lived in the United States, unlike the defendant here, and that was considered not enough in light of the aggravating factors such as the defendant's criminal history in that case. And here also, we have a lengthy criminal history. It includes two aggravated felonies, one for felon in possession of a firearm and one for second degree robbery, as well as the multiple reentries that were not present in the Lipman case. Let me ask you, our recent case in Rivas-Gonzalez suggests that if the cultural assimilation occurs after an illegal reentry, it doesn't count. But in this case, that argument was made, and the judge said, well, that's not what I'm thinking about. What I'm thinking about is the fact that he came here when he was eight, and basically, for his entire minority, he lived here before any illegal reentries and before any criminal activity. So what difference does that make in your view? Does that mean that if he comes back later, it sort of undoes the original cultural assimilation, or just that those are aggravating factors to be balanced against it? How does that play out? Well, if we start from the beginning, when he first left the United States and then illegally reentered, at that point, he very well may have had a good and compelling argument for cultural assimilation. But as events unfold, and he's convicted of crimes, deported with I think it is a balance, and I think these are aggravating factors that weigh against any claim of cultural assimilation. He shouldn't be here in the first place after those two deportations. And so to say that even though I know I'm not supposed to be here, I'm here, and I've assimilated, I think that rewards him in a sense for coming back and staying here. And I see that I have about two minutes left. Certainly want to reserve that. Mr. Libby. Good morning, Your Honors. May it please the Court, Jonathan Libby appearing on behalf of the appellee, Albert Ruiz Alonzo. Although it was not addressed by government counsel, the first issue I'd like to address is that this appeal, in fact, should be dismissed. The government failed to sufficiently demonstrate that it received the requisite authorization to further prosecute this appeal as required by 18 United States Code section 3742B. Well, there's a declaration that says it got approval, and why should it be any more of our concern in a jurisdictional sense? Well, in terms of the declaration itself, the problem with the declaration is Mr. Chang simply said that he reviewed their office records, and according to their office records, they received the approval. The fact that their office records may indicate that they received the approval doesn't necessarily mean that they received the approval. It only means that their office records are. I understand. My question is why should we care in terms of jurisdiction? In terms of jurisdiction? Yeah. No other circuit has ever said it's jurisdictional. Maybe something else. It certainly is a constraint on the U.S. Attorney's Office, but again, why should we care in a jurisdictional sense? Well, in a jurisdictional sense, no case that has addressed the jurisdictional issue, every circuit that's addressed the jurisdictional issue has said filing the notice of appeal is sufficient to establish jurisdiction. The problem with that is, look, the government, Congress has set up this gatekeeping function for the Attorney General or the Solicitor General. As we point out in our brief, if you compare this to the habeas corpus context of the certificate of appealability, Congress has set up the identical gatekeeping function. Oh, well, not really, because certificate of appealability depends upon our approval. That's correct. This approves all the executive branch's approval, and that's none of our business. I mean, we might, for example, say by a general or by an order or rule that, like you represent, you've counted the number of, you know, words in a brief, you represent that the approval of the Solicitor General has been had. But, you know, if an appeal is filed without the Attorney General's, excuse me, his approval, I imagine the Assistant U.S. Attorney is going to be in deep trouble with his boss. Well, but, Your Honor, Congress has set up this, I mean, they wrote the law, and the law is very clear. They cannot further prosecute the appeal. How is this different than the question whether any lawyer has the authority of the client to proceed? We don't look behind that in a jurisdictional sense. I mean, there may be some time when a lawyer is disciplined for filing something without the client's permission or something like that later on down the line, which is similar to the punishment that Judge Reimer is describing internal to the executive branch. But why would that, I mean, if we heard that maybe the client was unhappy that the appeal was filed, we don't lose jurisdiction of the case. So why would this be different? Well, again, and all I can do is compare it to the only other gatekeeping-type function that Congress has set up with respect to further prosecution of appeals, just like in the habeas corpus context where whoever loses in the district court in habeas corpus can file the notice of appeal. And that may create, initially, jurisdiction in this court. Unless they later get a certificate of appealability, they may not further prosecute that appeal in this court. And the fact that Congress decided that the gatekeeper in our context is the Attorney General or the Solicitor General versus, in the habeas context, it's a judge, shouldn't really make a difference. It's still a gatekeeping function that was not met. And just as a certificate of appealability, lacking a certificate of appealability, deprives this court of jurisdiction, so should failure to provide documentation that the government has received the requisite approval to prosecute their appeal. Well, if that doesn't work for you, then we've got a de novo look at what the district court did. And I'd like for you to explain how someone who has committed a series of very serious criminal offenses, including robbery, carrying a concealed weapon, vehicle theft, assault with a deadly weapon and driving under the influence, who marries somebody while he's in prison, has a child by her, has been deported and comes back into the country twice, is in any sense unusual or outside of the heartland of aliens who are here in this country illegally and have been ordered, deported twice and have never returned to commit crime again? Well, and, Your Honor, it's certainly unfortunate. It is true that Mr. Ruiz has committed crimes. I mean, we can't get around that fact. The court took that into consideration. And I believe what Judge Hatter did was that, look, if you look at the combination of factors, cultural assimilation certainly being one, but everything that he's done, you can't. What's he done to warrant any grace? I mean, just identify one thing that he's done that would take him out of the basic category of people that he is part of. Well, the fact that he had, in fact, turned his life around. I mean, Judge Hatter did find that. Lots of people have done that, too, right? Certainly. Certainly. I mean, of course, obviously, he's in front of the court. So it means that he didn't entirely turn his life around. Well, he was before the court because of his presence in this country. Yes. Yes. Well, and he's not supposed to do that. It's illegal. Absolutely, Your Honor. I believe what Judge Hatter was talking about is the fact that he, other than the fact that he is present here, he had culturally assimilated. He was here because his family was here. This is why he came back. Right. But, you know, in Lipman, it's a far more compelling story. I mean, no court's ever recognized a departure for – I mean, recognized the possibility of a departure for cultural assimilation as sort of analogous to family ties somehow. But in Lipman, the alien had a – I mean, if he was to be believed, he had a really good reason to come back into the country illegally, and that was to see a disabled daughter who had been the victim of a horrible crime. Right. But of course – And so that kind of gets your heart. You say, hey, this guy is different, and so forth. I look at this case, and I don't see anything that gets your heart or makes him at all different. He's not anywhere near as compelling a case as Lipman, where it wasn't granted. As the Court discussed in Rubens-Gonzalez, in Lipman, what the reason why Mr. Lipman was denied that departure was likely because he lied about his reason for coming back to the country, that, in fact, he was found – he said he was going to New York. He was found in Los Angeles committing a crime. So the fact is he – the Court found that he hadn't, in fact, come to this country – back to this country in order to be with his daughter. Here – look, Mr. Ruiz has family here. He grew up here. This is why he came back. So do an awful lot of aliens who are in this country illegally. In fact, I guess most of them. Well, that's right. Right? But if that's the case – I mean, just having family. If you're an illegal alien in this country, just having a wife and a child or a father who actually was in Mexico at the time, but never mind that. Assume his father was here. What's unusual about it? Well, it's unusual in that certainly he came back here because of family. And what this Court has said in Lipman and in Rubens-Gonzalez is if the reason is for cultural reasons, for familial reasons, and not for economic purposes, which I believe this Court is saying is perhaps more of the reason why most aliens come to this country, not because of their initial cultural ties. Here we have his cultural ties. He came here when he was eight years old. He grew up here. He was educated here. He established a family here. And he did establish a family here before he was deported. So Rubens-Gonzalez doesn't apply in this situation. I mean, he had his initial family growing up, but then he got married before he was deported. He had stepchildren that he cared for before he was deported. His family was here. And that's why he came back. And, of course, what the Court found here is that that, in addition to these other factors, one of which wasn't discussed was his lost opportunity to serve his state and federal sentences concurrently because of the delay in indicting him. That would give him only a couple of months, though, right? Four months, that's correct. But that was an additional factor that the Court considered. And what this Court has talked about in Cook, in terms of a combination of factors, departure, is that sentencing judges, and now I suppose this Court, since it's no overview, needs to look at the entire picture. And it's that unique complex of factors in each individual case that the Court should consider in determining whether or not to grant a departure. And I believe that's what Judge Hatter did here. And I believe this Court should affirm that, unless the Court has any further questions. Yeah. I do have a question because I didn't think what you just said was correct, and I wanted to go back to it. You said that he married before he had departed illegally. I don't think that's right. I said before he had been deported. His first deportation was May 14th of 1993. He was married in 1991. So he was arrested for illegal entry, and he departed voluntarily in 1989. That's correct. He was re-arrested in 89, and he was then paroled from prison and deported in 93. So you're saying the other stuff we should just ignore. Well, the other stuff, and the problem, yes. Okay. The situation with his illegal entry, he was charged with illegal entry, I believe, based upon the fact that he's been here since he was 8 years old. Illegally. Yes. It was not his choice to be brought here, obviously. When he was 8, his family brought him here. But he was convicted of that. He did voluntarily depart and then return. What the court has talked about in terms of the cultural assimilation departure in both Lippman and Rivas-Gonzalez is if he has what happens after he has been deported. Not just when he's voluntarily left in order to avoid being ordered to leave. Correct. Okay. Thank you. Thank you. Ms. Spiegel. For the record, we'd just like to state the government's position on the solicitor general approval is that it is not a jurisdictional requirement, as this Court has just said, and that in any event, we did provide sufficient evidence that we received solicitor general approval. Regarding the cultural assimilation departure, I'd like to point out that regarding this defendant's criminal history, the district court here did depart downward one criminal history level from a 6 to a 5. We're not contesting that on appeal. But in terms of some of the factors that defense counsel has mentioned, the court did take that into account as well. Counsel, I have sort of an overall question about how we effectively conduct de novo review in this area, which is quite new for us. In the past, one of the sort of underlying justifications for this whole system is that a district court sees dozens or hundreds of these cases and can make a judgment about what's inside the heartland or not based on that vast body of experience. How are we supposed to do that if we haven't been in the sentencing business? Where do we look besides our own assumptions to figure out whether certain behaviors or certain family situations or whatever it may be is within the heartland of all those many cases or not? Well, I think, first of all, Your Honor, the factual findings of the court are still subject to deference. So the facts found by the district court are accepted. So including the fact that he's turned his life around, for example, that would be a factual finding? Well, no. No. The factual finding would be anything he proffered to the court showing that's the conclusion, anything showing that he had turned his life around. Well, it's a fact finding. The question would be whether the fact finding is clearly erroneous.  Okay. So there is some deference still left, though, to the findings. But where do we look to find out if any, not just this individual, but any individual, any crime, whether it's within the heartland or not? How do we know? Well, I believe you would look to other precedents of this court and to the guidelines themselves. I think that's what a de novo review usually requires, that you would take the facts as found by the district court and review whether or not the court properly applied those facts to the strictures of the guidelines and to this Court's case law. Well, are we tethered in our consideration to 3553's factors? Well, to some degree, yes. Well, I mean, the sentence has to further the objectives of 3553, doesn't it? That's right. So that's sort of a tether, isn't it? Yes. Yes. Okay. All right. Thank you, counsel, for your argument in this case. I think, Mr. Libby, we don't see you again, right? No, I'm listening. Oh, you do get you again. Oh, good. All right. Thank you, counsel. The matter just argued will be submitted and we'll turn it back to you.
judges: Browning, Rymer, Graber